UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WENDY JENKINS, et al., | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| v. | ) Case No. 4:20-cv-01415-SRC |
| | ) |
| NORTH COUNTY GENERAL SURGERY, et al., | ) |
| | ) |
| Defendant(s). | ) |

### Memorandum and Order

Wendy Jenkins went into the hospital expecting to come out with a new knee.  But while the surgery initially appeared successful, an infection developed over the next few weeks, leading to emergency surgery—and ultimately to amputation of her leg.  Wendy and her husband Richard sued a number of parties, including Dr. Mariano Floro, Jr., a surgeon who arrived in the operating room only after Wendy suffered massive bleeding caused by the first surgeon's having severed a major artery and vein in Wendy's knee.  As Dr. Floro sees it, he faced a "life over limb" situation and did the best he could to prevent Wendy from bleeding out on the operating table.  Dr. Floro moves for summary judgment on the issue of causation, arguing that when he entered the picture, nothing he could have done would have saved Wendy's leg.  Doc. 104.  To the contrary, the Jenkinses' expert opines that Dr. Floro could and should have undertaken further surgery to save Wendy's leg.  The conflicting medical opinions quite simply present an issue that a jury must resolve.

I.      **Uncontroverted material facts**

In accordance with the Court's Local Rules, Dr. Floro and North County General Surgery (collectively, "Dr. Floro"[1]) filed a Statement of Uncontroverted Material Facts. Doc. 105-1. The Jenkinses did not respond, but filed their own Statement of Additional Uncontested Facts, Doc. 114, to which Dr. Floro responded, Doc. 120. The Court also granted Dr. Floro's unopposed motion for leave to file an Amended Statement of Uncontroverted Material Facts, Doc. 118, to correct typographical errors and add previously omitted exhibit pages.

As relevant here, Rule 56(c)(1) of the Federal Rules of Civil Procedure required the Jenkinses to support any assertion "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." And, Local Rule 4.01(E) required the Jenkinses to file a Response to Statement of Material Facts, setting forth with specific citations to the record "each relevant fact as to which the [Jenkinses] contend[] a genuine issue exists." The rule also provides that "[a]ll matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." E.D.Mo. L.R. 4.01(E).

Because the Jenkinses failed to respond to Dr. Floro's Statement of Material Facts, the Court deems the facts set forth in Dr. Floro's statement admitted pursuant to Local Rule 4.01(E). *See Reasonover v. St. Louis Cty.*, 447 F.3d 569, 579 (8th Cir. 2006). The Court also includes undisputed facts from the Jenkinses' Statement of Additional Uncontested Facts. Accordingly, the undisputed facts for purposes of summary judgment are as follows.

---

[1] The parties refer to Dr. Floro and his single-member medical practice, North County General Surgery, collectively as "Dr. Floro," and the Court follows suit. *See* Doc. 105 at p. 6; Doc. 113 at p. 7; Doc. 118-6 at p. 3.

Christian Hospital Northeast admitted Wendy[2] as a patient of orthopedic surgeon Dr. Jacques S. Van Ryn, who completed a left-knee-replacement surgery on Wendy at Christian Hospital.  Doc. 118 at ¶ 1.  At the time, Wendy's pre-existing conditions included: "osteoarthritis, DVTs; pulmonary emboli; traumatic brain injury; bipolar disorder; seizure disorder; ankle swelling; arthritis; asthma; bilateral chronic knee pain; Crohn's colitis; irritable bowel syndrome; fatigue; fibromyalgia; prior fracture; GERD; gastric ulcer; migraines; hyperlipidemia; hypothyroidism; insomnia; . . . neck injury; pre-diabetes; reflex sympathetic dystrophy; sciatica; sleep apnea; and morbid obesity."  *Id.* at ¶ 4.  She also had a contrast-dye allergy.  *Id.* at ¶ 5.  A few weeks later, Dr. Van Ryn diagnosed Wendy with a Methicillin Resistant Staphylococcus Aureus (MRSA) infection in her knee.  *Id.* at ¶ 2.  Dr. Van Ryn then readmitted her to Christian Hospital for a planned "left knee debridement" (removal of damaged or infected tissue) and "polyethylene / hardware exchange."  *Id.* at ¶ 3.  The parties place significant emphasis on the timeline of events from the point of readmission forward; the Court recounts it in detail.

Dr. Van Ryn began the procedure at 9:51 a.m. on October 11, 2019.  Doc. 118 at ¶ 6; Doc. 120 at ¶ 1.  In the back of the knee, he found and flushed out a large amount of purulent fluid and material (containing, or consisting of, pus), in a Baker's Cyst (a fluid-filled cyst behind the knee).  Doc. 118 at ¶ 7.

During the procedure, Dr. Van Ryn observed "marked copious bleeding bright-red blood" from the back of the knee after letting down a tourniquet.  *Id.* at ¶ 8.  The massive bleeding complicated Wendy's condition during the procedure.  *Id.* at ¶ 15.  Believing a problem existed with the popliteal artery (which branches from the femoral artery to deliver blood to the

---

[2] The Court refers to Wendy and Richard Jenkins by their first names to differentiate between them, and not to imply familiarity.

3

knee and lower leg), Dr. Van Ryn replaced the tourniquet, finished flushing out the knee, then replaced part of the knee implant and closed the wound. *Id.* at ¶ 9. The parties agree that at some point during the procedure, the popliteal artery and vein became severed. *Id.* at ¶ 10. The anesthesia assistant, Felix De Clercq, testified that he believed the surgical injury occurred by 10:30 a.m. *Id.* at ¶¶ 11–13.

About three hours into Dr. Van Ryn's surgery, Dr. Floro received an urgent request to come to the operating room to stop the bleeding. Doc. 118 at ¶¶ 14, 20; Doc. 113-1 at pp. 18:2–12, 23:8–14. At 12:11 p.m., Dr. Floro began an operation to repair the popliteal artery and vein, which required turning Wendy face-down to approach from the back of the knee. Doc. 118 at ¶ 17. Dr. Floro testified that he had to wait for Dr. Van Ryn to complete aspects of his surgery before repositioning Wendy and evaluating why she was bleeding. *Id.* at ¶ 21. Dr. Floro recalls that Dr. Van Ryn made a statement that "this lady might lose her leg," *id.* at ¶ 22; the Jenkinses do not offer anything to controvert this. *See* Docs. 113, 114. Dr. Floro also testified that it was reasonable to assume that Wendy had inadequate blood flow the entire time that Dr. Van Ryn had the tourniquet on. Doc. 118 at ¶ 23.

The list of diagnoses in Dr. Floro's operating room report included: "bleeding from the popliteal region; suspected injury to major artery; status post knee replacement and closure; and history of allergy to dye." *Id.* at ¶ 18. According to Dr. Floro, both the popliteal artery and vein were completely severed, with about three centimeters of both the artery and vein missing. *Id.* at ¶ 24. Due to the MRSA infection in the knee, he used a 6 mm Artegraft collagen graft for the repair. *Id.* at ¶¶ 25–26. Dr. Floro noted good blood flow into the graft and to the vein into the artery. *Id.* at ¶ 27. Dr. Floro also charted that the nerve seemed to have a partial laceration, and testified that the nerve was partially cut. *Id.* at ¶ 29. Dr. Floro testified that, even aside from the

4

injury to the popliteal artery and vein, he believed Wendy had permanent nerve damage. *Id.* at ¶ 30.

Dr. Floro testified that after the surgery Wendy was "stable, in terms of her vital signs," but was "not stable because her blood count [was] very low." Doc. 118 at ¶ 36; Doc. 120 at ¶ 10. He believed she was at a high risk of complications from a low blood count, plus her other pre-existing conditions. Doc. 118 at ¶ 37; Doc. 120 at ¶ 10. Wendy lost approximately 200 ml of blood during Dr. Floro's procedure, Doc. 118 at ¶ 31, but lost an estimated 3000 ml of blood total from the combined surgical procedures performed that day and received multiple blood transfusions, *id.* at ¶ 32.

Dr. Floro testified that it "was not ideal to subject her to a major operation that night, in the late evening, because going to do a second operation in the middle of the night would require full general anesthesia, with the patient at risk of having low blood count, you could end up with a disaster in the operating table, and that could be more a daunting problem. Cardiac arrest is what bothers me." *Id.* at ¶ 39.

When asked whether it was his opinion that "essentially, her leg was being sacrificed to preserve her life," Dr. Floro testified that "[t]he patient's long history of complicated medical problems, being anemic, also having some cardiac issue, as AFib, would not be a very, very friendly atmosphere, as far as subjecting her to another major operation in the middle of the night. So you are trying to save a leg at the risk of losing a patient on the table." *Id.* at ¶ 40. This was the main reason Dr. Floro did not want to take Wendy to the operating room in the middle of the night. *Id.* at ¶ 41.

Dr. Floro's notes state that he was not able to perform an arteriogram (a procedure using contrast dye and X-rays to observe the flow of blood through an artery and note any blockages)

due to Wendy's history of a contrast-dye allergy. *Id.* at ¶ 33. Heparin (an anticoagulant) therapy began and continued overnight and into the morning. *Id.* at ¶ 42. A status call Dr. Floro received from an intensive-care-unit nurse at close to midnight on October 11, 2019 was the last communication Dr. Floro received from the hospital, the nurses, or the critical-care physician until an unspecified time early in the morning of October 12, 2019. *Id.* at ¶¶ 43–44.

A nurse practitioner, Cynthia Johnson, who was on duty in the morning of October 12, 2022, did not attempt to call Dr. Floro. *Id.* at ¶ 45. However, she did attempt to contact other physicians, including Dr. Saad Bitar, an interventional cardiologist, and Dr. Vipul Kheterpal, a vascular surgeon. *Id.* at ¶ 46. These physicians either did not return calls or were not available. *Id.* at ¶ 47. At 8:20 a.m., Nurse Practitioner Johnson spoke with Dr. Jeffrey Jim, a vascular surgeon at Barnes-Jewish Hospital, who did not have privileges at Christian Hospital. *Id.* at ¶ 48.

Wendy wanted to be transferred to Barnes, *id.* at ¶ 50, and Cynthia Johnson's charting states that at 8:45 a.m. "Dr. Floro was here and okay with the transfer," *id.* at ¶ 49. According to Dr. Floro, Johnson had already begun the transfer process at that point. Doc. 113-1 at p. 104:11–25. Dr. Floro testified that he spoke with Wendy, her husband Richard, and her daughter to confirm that they wanted to go forward with the transfer. Doc. 118 at ¶ 51. Dr. Floro also called Barnes to make sure Wendy received attention right away when she arrived. *Id.* at ¶ 52.

EMS arrived at Christian Hospital at 10:20 a.m. and Wendy was out of the building at approximately 10:25 a.m., two and a half hours after the transfer process began. *Id.* at ¶ 53. Nurse Practitioner Johnson testified this was "very fast" for a patient to get out the door from Christian Hospital after requesting a transfer, and that she would not expect a transfer during the night shift to move any faster than two and a half hours. *Id.* at ¶¶ 54–55.

6

According to the Barnes Emergency Department Triage notes, Wendy arrived in the Barnes Emergency Department at 11:25 a.m.  *Id.* at ¶ 57.  Dr. Jeffrey Jim, a vascular surgeon, began surgery on Wendy at Barnes-Jewish Hospital on October 12, 2019 at approximately 1:00 p.m.  *Id.* at ¶ 58.  The Barnes records indicate that the pre-incision time out (a short pause in the operating room just before the first incision) for Dr. Jim's surgery began at approximately 1:35 p.m.  *Id.* at ¶ 59.  The parties do not dispute that Dr. Jim determined that the leg was not viable, Doc. 120 at ¶ 16, and had to amputate it above the knee.  Doc. 105 at p. 5; Doc. 118 at ¶¶ 59–60.

### A.      Dr. Jeffrey Jim's testimony

To support his Motion, Dr. Floro relies on the following deposition testimony of Dr. Jim:

> Q.  So if during her initial surgery on the 11th when she was having the liner exchanged, the infected liner in her knee replacement exchanged, if a tourniquet was placed on her leg somewhere between 10:30 and 11:00 a.m., and you know that she had the vascular injury during that surgery, and blood flow never returned to the leg up and to the point that you saw her and you had amputated her, the blood flow never returned.  I think what you are telling me, let me know if I'm wrong is, once that tourniquet is placed and blood flow is never returned, there is about a six-to-eight hour window that needs—that she needs to have flow return to that leg for it to be viable?
>
> \*\*\*
>
> A.  Well, I was going say we want to get it done within six to eight.  You know, is it a hundred percent not salvageable after six to eight?  I don't think anybody can tell you.  But I think in your world you guys live in the likely-or-not-kind of thing— a more-likely-than-not kind of thing.  If you get to six to eight, I think after that, it's more likely than not the leg is not going to be savable.  But that doesn't mean zero.

Doc. 118 at ¶ 60.  Dr. Jim further testified that, assuming he were to do a procedure to attempt to reestablish flow:

> Q.  So in best case scenario, once you start the procedure, assuming you are able to do it, it would take you a couple of hours to even reestablish flow?
>
> A.  Correct.

> Q. And so, if I told you that Miss Jenkins hit the ICU or was evaluated by the ICU physician at 5:50 p.m. on the 11th, and then—and then—and that's about seven-plus hours since she had that tourniquet put on in the surgery by Dr. Van Ryn. Are you following me so far?
>
> A. Again, I don't remember when she showed up, but I don't—whatever—
>
> Q. I will represent to you that surgery started at 9:50 a.m. He placed the tourniquet within an hour, I think, 10:50. So 5:50 we are at about seven hours?
>
> A. Yes.
>
> Q. And then it takes a while to get to Barnes, whatever time that is, and then it takes an hour and a half, maybe, to get her in the room, and then a couple more hours to even reestablish flow. Would using that timeline, can you —would you agree that more likely than not, even if a transfer had been initiated on October 11th to Barnes that her leg would still have been amputated?
>
> \*\*\*
>
> A. I'm going to answer. I think the question was by the time you are dealing with adding all of the hours, you know, I would have to say more likely than not an amputation would have been the end result rather than a limb salvage.
>
> Q. . . . [A]nd is that opinion to within a reasonable degree of medical certainty?
>
> A. Yes.

*Id.* at ¶ 61. Dr. Jim also testified as follows:

> Q. Okay. So just so I'm clear, the timeframe is six to eight hours within which to reestablish blood flow, correct?
>
> A. Yes.
>
> Q. Okay. And blood flow isn't reestablished until you are able to complete or substantially complete your surgery?
>
> A. Yes.

*Id.* at ¶ 62.

8

### B. Dr. Joseph Durham's testimony

The Jenkinses, in turn, rely on the rather contrary opinions and deposition testimony of their expert, Dr. Joseph Durham. Dr. Durham believes that Dr. Floro had until approximately 8:00 p.m. to restore blood flow to the leg. Doc. 120 at ¶ 12. He also testified that "the injury was at 10:30. So probably, by you know, 7:00 or 8:00 at night the dye [sic] was cast, I mean, just using our guideline of 6–8 hours." *Id.* According to Dr. Durham, Dr. Floro "should not have left the operating room until he had documented that he had restored circulation to the leg and the foot, unless she was so unstable that he thought he was risking her life by persisting" in his attempt to restore circulation. Doc. 120 at ¶ 14; Doc. 113-2 at p. 127:4–8. Dr. Durham testified that "there was no reason not to pursue [the surgery] for another hour or two," because Wendy was "not hemodynamically unstable"—in other words, she did not have "[p]rolonged abnormal blood pressure," a "prolonged abnormal pulse rate," or "EKG changes suggestive of a heart attack, something to that nature . . . ." Doc. 113-2 at pp. 109:1–13; 131:10–14; 139:14–24: 140:1–2.

According to Dr. Durham, the standard of care requires a vascular surgeon to assume—until proven otherwise—that a blood clot, rather than a spasm (i.e., a temporary constriction of the artery), is restricting blood flow. Doc. 113-2 at pp. 103:4–9; 198:13–24; 199:1. And although Dr. Durham acknowledged that he understood why Dr. Floro decided against performing an angiogram due to Wendy's documented dye allergy, Dr. Durham testified that the standard of care includes other ways to "exclude spasm as being the cause of the decreased blood flow to the leg and the foot." *Id.* at pp. 103:10–19; 138:15–24. Dr. Durham testified that heparin treatment is only reasonable after ruling out a blood clot, *id.* at p. 106:17–21, and that by prescribing heparin treatment without ruling out a clot, Dr. Floro deviated from the standard of

9

care, Doc. 120 at ¶ 15 (citing Doc. 113-2 at p. 103:4–9 ("[W]ithout an angiogram, you cannot assume that there's spasm there.")).

According to Dr. Durham, had Dr. Floro continued with surgical intervention and attempted to use a Fogarty catheter or conducted an arterial bypass, he would have restored blood flow and avoided amputation. *Id.* at ¶ 13. Dr. Durham also stated that even if Dr. Floro had extended the surgery and done some of the things Dr. Durham suggested, it was "possible but not likely" Dr. Floro would have failed to restore circulation. *Id.* at ¶ 13. In other words, according to Dr. Durham, if Dr. Floro had continued the surgery, "[m]ore than likely not [sic], it would have restored blood flow to [Wendy's] leg." Doc. 113-2 at p. 138:2–10.

**II.     Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).

The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a). And "[o]f course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

10

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) (citation omitted).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III.     Discussion

Dr. Floro myopically argues that he is entitled to summary judgment on the issue of proximate cause, because "no matter what surgical intervention would have occurred after the popliteal artery and vein were severed during Dr. Van Ryn's surgical procedure, it is more probable than not to a reasonable degree of medical certainty that the patient would have still required an amputation."  Doc. 105 at p. 1.  However, Dr. Floro ignores the evidence from the Jenkinses' expert that "[t]he standard of care allowed for several treatment options to address the arterial injury," including, among other things, "continuing surgery for as long as [she] remained stable or until a pulse was reinstated."  Doc. 113 at p. 2.

Here, the injury occurred in Missouri, and the parties agree that Missouri law governs. *See* Doc. 105 at p. 2; Doc. 113 at p. 3.  In a Missouri medical malpractice case, "[the] plaintiff[] must prove that defendants failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendants' profession and that their negligent act or acts caused [the plaintiff's] injury." *Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615

(Mo. 1995) (citing *Swope v. Printz*, 468 S.W.2d 34, 39 (Mo. 1971); M.A.I. 21.01). "In a medical malpractice case, where proof of causation requires a certain degree of expertise, the plaintiff must present expert testimony to establish causation." *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. 2012) (quoting *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 554 (Mo. 2008)).

"Missouri requires a showing of two types of causation: 'but-for' causation and 'proximate' causation." *Id.* (citing *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863, 865 (Mo. 1993)). In addition to "but-for" causation, which is "merely causation in fact," "legal" or "proximate" causation "requires some sort of direct connection." *Sundermeyer*, 271 S.W.3d at 554–55 (citing *Baker v. Guzon*, 950 S.W.2d 635, 646 (Mo. Ct. App. 1997) (noting that a negligence action will not lie, even where the "but for" test is satisfied, if the cause is remote and other, intervening events arise)). In Missouri, proximate causation generally means "that the injury must be a reasonable and probable consequence of the act or omission of the defendant." *Callahan*, 863 S.W.2d at 865 (citing *Foley v. Hudson*, 432 S.W.2d 205, 207 (Mo. 1968); *Floyd v. St. Louis Pub. Serv. Co.*, 280 S.W.2d 74, 78 (Mo. 1955)).

However, the Supreme Court of Missouri has cautioned that "a causation analysis should not lose sight of the ultimate issue:" rather than using the terms "proximate cause," "but for causation," or "substantial factor," Missouri courts "merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to cause' plaintiff's injury." *Sundermeyer*, 271 S.W.3d at 555 (citing *Callahan*, 863 S.W.2d at 862).

The Jenkinses rely on Dr. Durham's testimony that Dr. Floro "should not have left the operating room until he had documented that he had restored circulation to the leg and the foot, unless she was so unstable that he thought he was risking her life by persisting." Doc. 120 at

12

¶ 14; Doc. 113-2 at p. 127:4–8.  Dr. Durham testified that heparin treatment is only reasonable after ruling out a blood clot, Doc. 113-2 at p. 106:17–21, and that by prescribing heparin treatment without ruling out a clot, Dr. Floro deviated from the standard of care, Doc. 120 at ¶ 15 (citing Doc. 113-2 at p. 103:4–9 ("[W]ithout an angiogram, you cannot assume that there's spasm there.")).

According to Dr. Durham, had Dr. Floro continued with surgical intervention and attempted to use a Fogarty catheter or conducted an arterial bypass, Dr. Floro would have restored blood flow and avoided amputation.  Doc. 120 at ¶ 13.  And although Dr. Durham acknowledged that it was "possible but not likely" Dr. Floro would have been unable to restore circulation, *id.* at ¶ 13, he clarified that if Dr. Floro had continued with surgery, "[m]ore than likely not [sic], it would have restored blood flow to [Wendy's] leg," Doc. 113-2 at p. 138:2–10.

The record only points to one outcome on this motion.  The conflicting testimony of Dr. Jim and Dr. Durham on whether Wendy was stable enough to pursue Dr. Durham's suggested methods of addressing the lack of blood flow to her leg and foot creates a genuine issue of material fact for the jury to resolve.  Dr. Durham's testimony that "there was no reason not to pursue for another hour or two," because Wendy was "not hemodynamically unstable," Doc. 113-2 at p. 131:10–14—and that if Dr. Floro had done so, more likely than not he would have restored blood flow and saved the leg, *id.* at pp. 126:11–15; 138:2–10—raises a triable issue of whether Dr. Floro directly caused or contributed to Wendy losing her leg.  *See Sundermeyer*, 271 S.W.3d at 555–56 (finding plaintiff's expert's testimony created a genuine issue of material fact regarding the issue of causation); *see also Bone v. Ames Taping Tool Sys., Inc.*, 179 F.3d 1080, 1082 (8th Cir. 1999).  Thus, giving the Jenkinses the benefit of all reasonable inferences, Dr.

13

Durham's testimony provides sufficient evidence of causation under Missouri law to defeat Dr. Floro's summary-judgment motion.  *See Sundermeyer*, 271 S.W.3d at 555–56.

## IV. Conclusion

Accordingly, the Court denies Dr. Floro's [104] Motion for Summary Judgment.

So Ordered this 4th day of August 2022.

_____
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE

14