UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WENDY JENKINS, et al., | ) |
| | ) |
|    Plaintiff(s), | ) |
| | ) |
| vs. | ) Case No. 4:20-cv-01415-SRC |
| | ) |
| NORTH COUNTY GENERAL | ) |
| SURGERY, et al., | ) |
| | ) |
|    Defendant(s). | ) |

**<u>Memorandum and Order</u>**

Following a knee replacement in 2019, Wendy Jenkins developed an infection and ultimately lost her leg after several follow-up procedures. Wendy and her husband Richard sued a number of doctors and entities they claim negligently caused or contributed to the loss of Wendy's leg. Following the Jenkinses' settlement with the other Defendants, the Court denied Dr. Floro's summary-judgment motion. Doc. 135. The Court now takes up Dr. Floro's motions to exclude expert testimony, in which he invites the Court to arrogate to doctors the exclusive domain over expertise in such matters as, among other things, the costs of medical equipment, home modifications, and transportation. Docs. 100, 102. The Court declines the invitation.

**I.     Background**

The Court has recounted the facts of this case in its Memorandum and Order regarding North County General Surgery and Dr. Floro's (collectively, "Dr. Floro"[1]) summary-judgment motion, and does not repeat the facts here. *See* Doc. 135. In that Memorandum and Order the

---

[1] The parties refer collectively to Dr. Floro and North County General Surgery, Dr. Floro's single-member medical practice, and the Court follows suit. *See* Doc. 105 at p. 6; Doc. 113 at p. 7; Doc. 118-6 at p. 3.

1

Court also explained some of the medical terminology at issue in this case and likewise does not repeat those explanations here.

## II. Legal Standard

Federal law governs the admissibility of expert testimony in diversity cases in federal court. *Clark v. Heidrick*, 150 F.3d 912, 914 (8th Cir. 1998). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court interpreted the then-effective version of Rule 702 of the Federal Rules of Evidence to require district courts to be certain that expert evidence based on scientific, technical, or other specialized knowledge is "not only relevant, but reliable." 509 U.S. 579, 590 (1993). The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

> Post-*Daubert* amendments to Rule 702 clarify the standard:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Rule 702 has been amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and to the many cases applying *Daubert* . . . ." (internal citation omitted)).

The Eighth Circuit has fleshed out the Rule 702 standards.  Proposed expert testimony must meet three criteria to be admissible under Rule 702.  "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy."  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Second, the proposed witness must be qualified to assist the finder of fact."  *Id.* (citation omitted).  "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires."  *Id.* (internal quotation marks omitted).  To meet the third criterion, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)–(d).

"Federal Rule of Evidence 702 reflects an attempt to liberalize the rules governing the admission of expert testimony."  *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007) (citing *Lauzon*, 270 F.3d at 686).  The rule "favors admissibility if the testimony will assist the trier of fact."  *Clark*, 150 F.3d at 915.  Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility."  *Id.* (citation and internal quotation omitted).

Under Rule 702, the trial court has gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert*, 509 U.S. at 597).  "When making the reliability and relevancy determinations, a district court may consider:  (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or

3

potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.*

As a general rule "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)). However, "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." *Id.* (citing *Hartley*, 310 F.3d at 1061). An expert opinion is fundamentally unsupported when it "fails to consider the relevant facts of the case." *Id.* With this standard in mind, the Court addresses Dr. Floro's two motions in turn.

### III. The Jenkinses' expert Jan Klosterman

Wendy[2] and Richard Jenkins retained Jan Klosterman, R.N., to provide an opinion regarding a "life-care plan" for Wendy. A life-care plan is an assessment of a person's future medical needs (and associated costs). Thus, the Jenkinses offer Klosterman's opinions as evidence of damages. Klosterman is a Certified Nurse Life Care Planner and has maintained that certification since 1999. Doc. 112-1 at pp. 1–2. She has been a Registered Nurse since 1979. *Id.* at p. 1. She is also Medicare Set-Aside Consultant Certified and is a Certified Brain Injury

---

[2] The Court refers to Wendy and Richard Jenkins by their first names to differentiate between them, and not to imply familiarity.

4

Specialist.  *Id.*  She is a member of the American Association of Legal Nurse Consultants and the American Association of Nurse Life Care Planners, and previously held leadership positions in both organizations.  *Id.* at p. 1.  She has practiced life-care planning for over twenty years and estimates that she has reviewed "closer to a thousand" cases in that time.  Doc. 112-3 at p. 151:4–6.

### A.    Klosterman's opinions

Klosterman's life-care plan sets out the various medical care that Klosterman opines Wendy will need for life, such as physician care, medication, medical procedures and treatments, prosthetics, and modifications to her home and transportation.  Klosterman itemizes these costs and offers a "low" and "high" estimate for each—with the lifetime total cost of care ranging from approximately $2.3 to $3.4 million.

Following an introduction describing Klosterman's credentials, methodology, and reliance materials, Klosterman's expert report has several parts:  (1) a narrative—consisting of a medical records chronology, a video nursing assessment, and nursing diagnoses; (2) a life-care plan; and (3) a summary of costs.  Doc. 112-2 at p. 2.  The report also contains a list of participating healthcare professionals and cost providers, as well as a table of medical records Klosterman reviewed.

Klosterman states that she based her life-care plan on a video nursing assessment, medical record review, and collaboration with treating physicians.  As part of this process, she also identified the following "nursing diagnoses":  impaired walking, impaired physical mobility, risk for falls, self-care deficit, chronic pain, constipation, impaired home maintenance, impaired social interaction, and risk for caregiver-role strain.  Doc. 112-2 at pp. 32–33.  Klosterman states

5

that these nursing diagnoses formed "a basis for future care needs and recommendations." *Id.* at p. 32.

Based on these inputs, Klosterman's life-care plan outlines "present and future needs as dictated by the onset of Wendy's above-the-knee amputation and associated disability." Doc. 112-2 at pp. 3–4. These needs include: physician care, diagnostic testing, medical procedures, medications, medical equipment and supplies, therapies and services, prosthetics and orthotics, adaptive equipment, home modifications, and transportation. *Id.* at pp. 33–34.

In the cost summary section, Klosterman itemizes and totals all of the costs associated with the life-care plan's recommendations. *Id.* at pp. 37–41. Klosterman used "local service providers, internet research, or published databases of charge data" to calculate costs in today's dollars. *Id.* at p. 4. For the purpose of calculating costs of lifetime care, Klosterman used a life expectancy calculation based on the June 2019 U.S. National Vital Statistics System Report. *Id.* at p. 4. Klosterman calculated a "lifetime low" total of $2,252,651.58, and a "lifetime high" total of $3,375,311.48. *Id.* at p. 41.

Klosterman states that:

> All opinions expressed herein are stated with a reasonable degree of Nurse Life Care Planning certainty. This plan was developed using recognized standards and methodology set forth by the American Association of Nurse Life Care Planners and the nursing process as defined by the American Nurses Association. The latter also endorses that nurses not only carry out interventions prescribed by other healthcare providers but also independently establish and deliver/delegate plans of care. In addition, all opinions are based on the principles of nursing science (biological, physical, behavioral, and social) and this professional's nursing experience, clinical judgment, and specialized education as a Certified Nurse Life Care Planner.

*Id.* at p. 4.

B.     **Dr. Floro's motion to exclude**

Dr. Floro moves under Rule 702 to exclude Klosterman's opinions. Dr. Floro moves to exclude the entirety of Klosterman's life-care plan because a physician did not review and approve it. Doc. 101 at p. 1. He also argues that the cost amounts in Klosterman's life-care plan fail to comply with Mo. Rev. Stat. § 490.715, which defines recoverable past medical costs for Missouri medical-malpractice cases. The Court addresses these arguments in turn.

1.     **Federal Rule of Evidence 702**

First, Dr. Floro argues that Klosterman's life-care plan does not constitute scientific "knowledge" under Rule 702 because she is not a medical doctor and "cannot testify to a reasonable degree of medical certainty that each of the projected costs in her life care plan will be incurred or are related to Defendants' alleged negligence." Doc. 100 at p. 2. In his reply, he similarly argues that the life-care plan is "speculative" and "not based on medical opinion" because Klosterman "is not a medical doctor" and "has not had a medical doctor review her plan." Doc. 122 at p. 2.

But Dr. Floro does not cite any authority for his medical-doctor-review-required rule, and his motion misses the mark in that Rule 702 does not limit experts to *scientific* knowledge but more broadly permits expert testimony by those who have "other specialized knowledge[.]" Fed. R. Evid. 702(a). In his reply he cites a number of cases supporting the proposition that a life-care plan "must be supported by medical evidence," but he fails to identify where Klosterman's life-care plan lacks such support. Doc. 122 at p. 2. Similarly, in his reply he cites *Sermchief v. Gonzales*, 660 S.W.2d 683, 689–90 (Mo. 1983), for the proposition that "[a] registered nurse is not qualified to render a medical diagnosis or opine on prognosis," but he does not identify any aspects of Klosterman's opinions that qualify as her own medical diagnoses. Doc. 122 at p. 2.

7

In response, the Jenkinses argue that Klosterman did not offer her own medical diagnoses; rather, they argue her opinions are based on medical records, videoconferences with the Jenkinses, and consultation with Wendy's care providers. Doc. 112 at pp. 2, 42. The Court addresses the parties' Rule 702 arguments below, following the Eighth Circuit's fleshed-out Rule 702 framework. *See Lauzon*, 270 F.3d at 686.

### a.     Relevance

First, the "basic rule of relevancy" in Rule 702 requires that "evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Lauzon*, 270 F.3d at 686; Fed. R. Evid. 702(a). In this case, if the jury determines that Dr. Floro directly caused or contributed to the loss of Wendy's leg, the jury must then determine the amount of compensation that Wendy should recover for future medical care and expenses as a result of losing her leg.

Dr. Floro does not object to the relevance of life-care planning to the issue of damages generally. Though he does not characterize them as "relevance" arguments, Dr. Floro argues that Klosterman based the costs listed in the life-care plan on amounts charged, not what could be accepted as final payment, Doc. 101 at p. 2, and that because Klosterman is not a medical doctor, she is unable to testify that the costs in the life-care plan are related to the alleged negligence in this case, Doc. 101 at pp. 1–2. The Court addresses those arguments in the "Qualifications" and "Reliability" sections below.

As to relevance, Klosterman incorporated the reports of multiple treating physicians and medical providers regarding the type and frequency of medical care Wendy will require in the future as a result of her losing her leg, obtained the costs of such care in Wendy's local community, and developed an overall life-care plan for Wendy and the costs associated with the

8

plan. The Court finds that Klosterman's opinions are relevant to the issue of damages and will assist the jury in determining the amount of future medical expenses. *See Bayes v. Biomet, Inc.*, No. 13-cv-00800-SRC, 2020 WL 5594059, at *9 (E.D. Mo. Sept. 18, 2020); *Roach v. Hughes*, No. 13-cv-00136, 2015 WL 3970739, at *3 (W.D. Ky. June 30, 2015).

### b. Qualifications

Second, "the proposed witness must be qualified to assist the finder of fact." *Lauzon*, 270 F.3d at 686; Fed. R. Evid. 702. Dr. Floro's argues that because Klosterman is not a medical doctor, her opinions regarding future medical costs are "speculation" because they "have not been specifically reviewed and approved by a physician." Doc. 100 at p. 2.

The Court notes that Dr. Floro does not object to Klosterman's life-care planning qualifications; rather, he focuses on the fact that she is not a medical doctor. Doc. 100 at p. 2. Dr. Floro contends that because Klosterman is not a medical doctor, she "cannot testify to a reasonable degree of medical certainty that each of the projected costs in her life care plan will be incurred or are related to the Defendants' alleged negligence." Doc. 101 at pp. 1–2. Dr. Floro also points out, without further elaboration, that Klosterman "has not practiced hands-on nursing in years and by her own admission is retired." Doc. 100 at p. 2.

But Dr. Floro fails to articulate why a medical doctor has any more qualifications than a life-care planner to prepare a plan that details the *costs of* physician care, medication, medical procedures and treatments, prosthetics, and modifications to her home and transportation. *See* Doc. 100. The Court fails to see how a medical doctor has any particular qualifications in these areas, especially given that no evidence in the record suggests, nor does the Court's experience indicate, that doctors themselves handle billing for medical services or durable medical equipment, much less estimating or billing for home modification or transportation.

9

The Jenkinses argue that "Klosterman's opinions do not include her own independent medical diagnosis" and that she is not a medical doctor, but a life-care planner. Doc. 112 at p. 2. As mentioned, Klosterman has been a Certified Nurse Life Care Planner for over twenty years. Doc. 112-1 at pp. 1–2. She has been a Registered Nurse since 1979. *Id.* at p. 1. She is also Medicare Set-Aside Consultant Certified and is a Certified Brain Injury Specialist. *Id.* She is a member of the American Association of Legal Nurse Consultants and the American Association of Nurse Life Care Planners, and previously held leadership positions in both organizations. *Id.* at p. 1. She estimates that she has reviewed "closer to a thousand" cases during her more than twenty-year life-care-planning practice. Doc. 112-3 at p. 151:4–6.

Further, as the Jenkinses point out, courts in multiple jurisdictions have found Klosterman qualified to provide life-care-planning opinions. Doc. 112 at pp. 2–3 (citing *Clanton v. United States*, No. 15-cv-00124, 2017 WL 2637795, at *10 (S.D. Ill. June 19, 2017), *vacated on other grounds*, 943 F.3d 319 (7th Cir. 2019); *Lowe v. Mercy Clinic E. Communities*, 592 S.W.3d 10, 26–29 (Mo. Ct. App. 2019); *Bauer v. Mem'l Hosp.*, 377 879 N.E.2d 478, 487–88 (Ill. App. Ct. 2007)); *see also Lesch v. United States*, 612 F.3d 975, 983 (8th Cir. 2010) (affirming district court's award, after a bench trial, of $100,000 in future medical damages, where evidence of damages included a life-care plan Klosterman helped prepare).

Of course, the Court agrees that since Klosterman is not a medical doctor, she cannot independently assess Wendy's medical needs from the standpoint of a physician or intrude into the realm of a physician's care recommendations. The Court recognizes that as part of her life-care plan, Klosterman did create "nursing diagnoses." Doc. 112-2 at pp. 32–33. Klosterman defines "nursing diagnosis" as "a clinical judgment about the patient's response to actual or potential health condition(s) or needs." *Id.* at p. 32. Further, she states that a "[nursing]

diagnosis provides the basis for determination of a plan to achieve expected outcomes." *Id.* But as Dr. Floro himself acknowledges, a nursing diagnosis is not the same as a medical diagnosis. *See* Doc. 122 at p. 2 (citing *Sermchief*, 660 S.W.2d at 689–90). Based on Klosterman's education, training, and experience, the Court finds that Klosterman is qualified to testify as a nurse life-care planner regarding the future costs of Wendy's medical care and expenses.

### c. Reliability

"Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Lauzon*, 270 F.3d at 686 (internal quotation marks omitted). To meet this third criterion, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).

Dr. Floro further presses his doctors-as-fonts-of-all-knowledge argument, positing that because Klosterman is not a medical doctor and a medical doctor did not review Klosterman's life-care plan, the life-care plan must be speculative and unreliable. Doc. 101 at p. 2; Doc. 122 at p. 2. Dr. Floro further argues that "Klosterman's plan really is based on her subjective opinions as to future medical needs where the final plan is not based on actual assessments of Ms. Jenkins by her treating physicians." Doc. 101 at p. 2.

The Court agrees with the Jenkinses that Dr. Floro fails to identify any specific parts of Klosterman's opinions that he claims are unsupported by a physician's medical assessment. Doc. 112 at p. 3. The Court also notes that while Dr. Floro cites a number of cases in his reply brief where courts excluded certain testimony or opinions that were not based on a medical doctor's assessment or recommendation, Dr. Floro again fails to identify any particular aspects

11

of Klosterman's opinions that he believes similarly lack support. *See* Doc. 122 at pp. 1–2. Rather, his sole argument is that because Klosterman is not a doctor and did not have a doctor review the life-care plan, it must not be based on medical opinion. Dr. Floro does not provide, nor can the Court identify, any authority supporting the arrogation of life-care-plan expertise to medical doctors, and the Court rejects it. To the extent Dr. Floro has evidence that aspects of the life-care plan are unsupported by medical opinion, he may cross-examine her on that basis.

Dr. Floro also argues that because Klosterman "typically" has a doctor review her life-care plans, the fact that she did not in this case "should be sufficient for the [C]ourt to determine that her Life Care Plan is not based on the scientific method under the *Daubert* standard." Doc. 122 at p. 3 (citing *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502–03 (9th Cir. 1994) (upholding the rejection of expert testimony as unreliable where the experts failed to follow the scientific method by "[c]oming to a firm conclusion first and then doing research to support it")). But the Court notes that while Klosterman acknowledged that she does have a treating doctor review her life-care plan "in the majority of situations," she was "comfortable with it as it is" and stated that doctor review is "not a requirement." Doc. 112-3 at pp. 131:18–132:9. And Dr. Floro does not contest Klosterman's claim that in developing the life-care plan she followed the "recognized standards and methodology set forth by the American Association of Nurse Life Care Planners." Doc. 112-2 at p. 4.

The Court notes that in addition to his doctors-as-fonts-of-all-knowledge argument, Dr. Floro points out that Klosterman testified some of the projected costs in the plan, such as those associated with a spinal cord stimulator, are "undecided" or "undetermined." Doc. 101 at p. 2. In his reply, Dr. Floro lists the stimulator and "pain-management costs" as examples of "numerous provisions of the plan that are speculative." Doc. 122 at p. 2. As discussed more

12

fully below, *see infra* Section III.B.2, Dr. Floro also argues that the life-care plan is unreliable because the cost amounts in the life-care plan are based on charged amounts, rather than on the amounts that healthcare providers would accept as full and final payment. Doc. 100 at p. 3.

      The Court notes that, "like all other elements of damage in Missouri," future medical damages must be "reasonably certain to occur"—and to recover, the Jenkinses must prove the need for future medical treatment to a reasonable degree of certainty. *See Lesch*, 612 F.3d at 982 (citing *Thomas v. FAG Bearings Corp. Inc.*, 846 F. Supp. 1400, 1408 (W.D. Mo. 1994); *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 210–11 (Mo. 1991) ("The standard for recovering for future consequences requires evidence of such a degree of probability of those future events occurring as to amount to reasonable certainty.")). If Dr. Floro has evidence that any specific portions of Klosterman's life-care plan are unsupported or unnecessary, he may cross-examine Klosterman on that basis. *See, e.g.*, *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). But the Court does not find Klosterman's life-care plan "so fundamentally unsupported that it can offer no assistance to the jury." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007).

      The Supreme Court has made clear that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141. Many courts—including this one—have permitted testimony from life-care planning experts. *See, e.g., Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 170–71 (1st Cir. 2005); *Sorrells v. ADT, LLC*, No. 14-cv-00378, 2015 WL 4887988, at *2–4 (E.D. Mo. Aug. 17, 2015); *Roach*, 2015 WL 3970739, at *2–4 ("Life care planners reasonably rely on information

13

from medical records, plaintiffs' treating physicians, and meetings with plaintiffs."); *Block v. Woo Young Med. Co.*, 937 F. Supp. 2d 1028, 1048 (D. Minn. 2013).

The Court finds Klosterman's methodology in this case sufficiently reliable. In formulating her opinions, Klosterman reasonably relied on Wendy's medical records, consultations with treating physicians, and a meeting with the Jenkinses. Doc. 112-2 at pp. 3–4; *see, e.g.*, *Bayes v. Biomet, Inc.*, No. 4:13-CV-00800-SRC, 2020 WL 5594059, at *9 (E.D. Mo. Sept. 18, 2020) (finding life-care plan methodology sufficiently reliable). Dr. Floro has not provided any support for his argument that a medical doctor must review a life-care plan for the planner's testimony to be admissible. And to the extent that Dr. Floro has evidence that certain portions of Klosterman's opinions lack support or are "undetermined," he may cross-examine her on that basis.

The Court finds that Klosterman is qualified to opine as a nurse life-care planner regarding the life-care plan she prepared for Wendy, and that Klosterman's opinions are both relevant and reliable. Accordingly, the Court denies Dr. Floro's motion to exclude her testimony under Rule 702.

### 2. Mo. Rev. Stat. § 490.715

Second, Dr. Floro argues that certain projected expenditures labeled "undecided" or "undetermined" in the life-care plan, as well as Klosterman's methodology of basing costs on "charged amounts" rather than amounts accepted for payment, violate Mo. Rev. Stat. § 490.715. Dr. Floro points out that under that statute, "recoverable *past* medical costs are the plaintiff's 'actual cost' for medical care or treatment, which is defined as the amounts required to satisfy plaintiff's medical bills plus any outstanding balances." Doc. 101 at p. 3 (emphasis added) (citing Mo. Rev. Stat. § 490.715). Dr. Floro argues that future cost estimates like those in

14

Klosterman's life-care plan thus "do[] not accurately reflect what may be actual costs in the future under Missouri's statute." *Id.*

In response, the Jenkinses point to *Lowe*, a Missouri Court of Appeals case where the defendant similarly argued that Klosterman's life-care plan's projection of future medical costs based on amounts charged violated § 490.715. Doc. 112 at p. 3 (citing *Lowe*, 592 S.W.3d at 25–26). The *Lowe* court rejected this argument, finding that the statute "does not apply to the admissibility of evidence of future medical charges that, by definition, have yet to occur." *Lowe*, 592 S.W.3d at 26. The court noted that "the statute by its plain language—as a codification of the common-law collateral source rule—is concerned solely with evidence of amounts *already charged or paid*." *Id.* (citing Mo. Rev. Stat. § 490.715); *see also id.* (noting that the collateral-source rule "prevents a *tortfeasor* from reducing his or her liability to a plaintiff by proving that payments *were made to the plaintiff* by a collateral source" (citing *Smith v. Shaw*, 159 S.W.3d 830, 832 (Mo. 2005))). Dr. Floro does not provide any authority to the contrary—in fact, he does not address the issue at all in his reply. *See* Doc. 122.

Klosterman's life-care plan does not violate § 490.715. The Court denies Dr. Floro's motion to exclude Klosterman's opinions and testimony.

### IV. The Jenkinses' standard-of-care experts

Based on the Jenkinses' Rule 26 expert disclosures, Dr. Floro claims that "certain expert witnesses may be asked to testify in areas outside their skill set." Doc. 103 at p. 3. Dr. Floro argues that the Court should not allow "Plaintiffs' experts who do not practice vascular surgery" to opine "regarding the standard of care or the scope of practice for a vascular surgeon, vascular surgery or what a vascular surgeon 'should do' under any particular circumstances or clinical

15

scenarios," as "such opinions lack reliability and validity." Doc. 103 at p. 1. Dr. Floro takes issue with two of the Jenkinses' retained experts and two non-retained experts.

### A. Dr. Jeanette Capella

The Jenkinses' expert Dr. Jeanette Capella is the Associate Medical Director of Trauma Services at the Iowa Methodist Medical Center. Doc. 113-3 at p. 185. She is also an Adjunct Clinical Assistant Professor in the Department of Surgery at the University of Iowa Carver College of Medicine. *Id.* She is board certified in general surgery and surgical critical care and is a fellow in the American College of Surgeons. *Id.* at pp. 185, 192, 204. The Jenkinses retained Dr. Capella to provide "opinions relative to care and treatment received by Wendy []Jenkins leading up to the amputation of her left leg." Doc. 113-3 at p. 203.

According to the Jenkinses' Rule 26 expert disclosures, Dr. Capella's opinions include the following:

> The standard of care required the critical care team (Dr. Masetti and any professional responsible for monitoring the vascular injury of Wendy Jenkin's [sic]) to regularly inspect the site of the anastomosis [(a surgical connection between two structures)] for occlusion. The Barnes Hospital records indicate that a clot was found at the site of the anastomosis. Not discovering the anastomosis had failed was a deviation from acceptable vascular practice and standard of care for critical care medicine.

Doc. 103 at p. 3 (quoting Doc. 103-1 at p. 6). Dr. Capella testified that by "any professional responsible for monitoring the vascular injury," she "was thinking of Dr. Masetti and the nurse practitioner who came in the next morning." Doc. 113-3 at pp. 86:15–25; 87:1–3. Dr. Capella also added that she was not critical of the nurse practitioner. Doc. 113-3 at p. 87:2–12.

Dr. Floro argues that Dr. Capella is not a vascular surgeon, and that Dr. Capella testified that she was not going to offer standard-of-care opinions with respect to Dr. Floro. *Id.* at pp. 3–4 (citing Doc. 113-3 at pp. 56:12–25, 57:1). Thus, Dr. Floro argues that "[a]ny testimony by Dr.

16

Capella regarding Dr. Floro's standard of care or the standard of care for the 'vascular team' should be prohibited." *Id.* at p. 4. Dr. Floro does not explain who he means by "vascular team." *See id.* Nor do the Jenkinses explain the relevance of Dr. Capella's testimony now that Dr. Masetti, whom Dr. Capella was going to provide standard-of-care opinions about, is no longer a defendant in the case. The Court expects the parties to be prepared to further address at the pretrial conference the motion as to Dr. Capella.

B.   **Dr. Raymond Vance**

In their Rule 26 disclosures, the Jenkinses included a letter from Dr. Raymond Vance, an orthopedic surgeon, whom the Jenkinses retained to provide "opinions relative to the orthopedic care received by Wendy Jenkins on October 11 and 12, 2019." Doc. 103-1 at p. 16. In the letter, Dr. Vance opined that "Dr. Van Ryn and Christian Hospital's staff's caring for Wendy on October 11 and 12, 2019 deviated from the accepted standards of care by failing to adequately monitor her leg for viability and failed to transfer her to a facility with a higher level of expertise to revascularize the extremity." Doc. 103-1 at p. 16. Dr. Vance believes that "[h]ad Van Ryn and/or the hospital staff acted with reasonable care, . . . it is most probable Ms. Jenkin's [sic] leg would not have required amputation." *Id.*

Dr. Floro argues that "[w]hether Ms. Jenkins was in a position to continue with a vascular surgery procedure or to undergo additional vascular surgery procedures on 10/11/2019 is a question for a vascular surgeon, not an orthopedic surgeon." Doc. 103 at p. 4. Other than mentioning that "Dr. Vance is an orthopedic surgeon," Doc. 115 at p. 2, the Jenkinses do not respond to Dr. Floro's argument regarding Dr. Vance.

Dr. Floro moves to exclude any opinion by Dr. Vance regarding "whether Ms. Jenkins was so unstable as to be incapable of tolerating an additional or further surgery to explore and

17

address her left leg occlusion." *See* Doc. 103 at p. 4.  The Court notes that the Jenkinses do not respond to Dr. Floro's argument, and did not disclose any opinion by Dr. Vance regarding the stability issue.  Because the Court will not permit Dr. Vance to offer any opinion not included in his report, Dr. Floro's Rule 702 motion regarding Dr. Vance is not well taken.  *See* Fed. R. Civ. P. 37(c)(1); *McMahon*, 5 F.4th at 905.

        **C.**    **Dr. Calvin Williams and Felix Cyril Georges de Clercq**

Among their list of non-retained, Rule 26(a)(2)(C) witnesses, the Jenkinses identified Dr. Calvin Williams, the anesthesiologist during Dr. Floro's surgical procedure, and Felix Cyril Georges de Clercq, the anesthetist—also known as an anesthesiologist's assistant.  Doc. 103-1 at p. 7; Doc. 118-3 at pp. 37:7–39:10.  During his deposition, Dr. Williams responded to a question from Mr. Hunsaker, counsel for Dr. Floro, as follows:

> [Mr. Hunsaker] Q: Okay. And you said before you are not a surgeon, you are not an orthopedic surgeon or a vascular surgeon. So you don't have any opinions or thoughts about the surgeries that were performed or alternatively the possibility of a second surgery after the patient left your care. Is that fair?
>
> [Dr. Williams] A: That is fair.

Doc. 115-1 at p. 19:1–7.  In their Rule 26 disclosures, the Jenkinses state that:

> It is suspected [Dr. Williams and de Clercq] may have opinions as to plaintiff's hemodynamic stability at the conclusion of the vascular repair surgery on October 11, 2019.  These witnesses are expected to provide testimony as to the condition of the patient as recorded in the anesthesia records compiled by each of them and/or at their direction.  It is further anticipated these witnesses will testify there is no finding within these records that demonstrate Wendy Jenkins was so hemodynamically unstable to continue with surgery or be returned to surgery for the suggested interventions of angiogram and further fogarty exam (embelectomy).

Doc. 103-1 at p. 7.

Dr. Floro takes issue with the last sentence, pointing out that "neither of these witnesses are vascular surgeons, or have ever practiced surgery, let alone vascular surgery."  Doc. 103 at p. 4.  Thus, Dr. Floro argues, "any opinions by these witnesses as to whether Ms. Jenkins could

18

continue or return to surgery for a vascular procedure is pure speculation, and not based on credible, admissible evidence under either Daubert [sic] or the Federal Rules of Evidence." *Id.*

The Jenkinses respond that "[t]he purpose of the anesthesiologist and anesthetist is to monitor the stability of patients—all patients" and that "there are not different anesthetist[s] for orthopedic procedures versus vascular patients." *Id.* According to the Jenkinses, "the anesthetist . . . informs the surgeon as to the stability of the patient," not the other way around. *Id.* The Jenkinses further argue that Dr. Williams's deposition, which includes a "succinct overview of the role of the anesthesia team during surgery," provides a "sufficient foundation to meet the requirements of *Daubert* and Rule 702." *Id.*

In reply, Dr. Floro speculates that the Jenkinses will ask Dr. Williams and de Clercq to "address the issue of medical causation as to future surgery." Doc. 123 at p. 2. Dr. Floro argues that the Court should not permit Dr. Williams and de Clercq to "make a leap" from their testimony that "the patient's vital signs were stable at certain points" to the opinion that she "was able to return or continue with surgery from the standpoint of a surgeon." *Id.* The parties do not further articulate the difference between the standpoint of a surgeon and the standpoint of an anesthesiologist as it relates to a patient's ability to undergo further surgery. The Court will not hazard a guess on that point and expects the parties to be prepared to further address at the pretrial conference the motion as to these experts.

## V.     Conclusion

Accordingly, the Court denies [100] Defendants' *Daubert* Motion Regarding Jan Klosterman. The Court denies in part and holds in abeyance in part [102] Defendants' *Daubert* Motion Regarding Plaintiffs' Standard of Care Experts, as set forth in detail above.

19

So Ordered this 19th day of August 2022.

_____
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE